UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dinesha Sharp,  )
 )
    Plaintiff,  )
 )
v.  )  No. 14 CV 50344
 )  Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,  )
 )
    Defendant.  )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Dinesha Sharp brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits. Although plaintiff has raised several arguments, the Court finds that a remand is warranted based on the treating-physician rule. 20 C.F.R. §404.1527(c).

At issue is whether plaintiff's alleged mental impairments, notably bipolar disorder, prevent her from working full-time. After plaintiff filed her disability applications, two state agency doctors (Hudspeth and Kuester) opined that plaintiff had an anxiety disorder causing moderate limitations in social functioning and concentration, but that she still had the capacity to do unskilled work without frequent public interaction. During this period, plaintiff was treated by several doctors and therapists including Dr. Tawfik, her primary care physician; Dr. Rizvi, a psychiatrist; Ms. Reddy, a social worker; and Mr. Holm, also a social worker. They provided assessments that plaintiff believes support her claim for disability. *See* Ex. 5F, 8F, 9F, 15F, 23F.

This case has a somewhat unusual procedural history in that three administrative hearings were held. At the first one, on May 24, 2012, plaintiff's attorney asked that the ALJ procure a psychological consultative examination because the medical opinions were varied. The ALJ agreed, and after the hearing, Dr. John Peggau interviewed plaintiff and issued a report. R. 838-

1

842. Dr. Peggau's report was critical of plaintiff, calling her a malingerer and stating that this fact made it hard to reach any definitive diagnosis. The ALJ sent the report to plaintiff's counsel and informed him that he could request a supplemental hearing where he could question Dr. Peggau. Counsel accepted the offer, and a second hearing was held on January 23, 2013. But this hearing was cut short because no one arranged for Dr. Peggau to be there. The ALJ and counsel agreed that a third hearing was needed.[1] The ALJ proposed several options. One was to call Dr. Peggau as a witness. Another was that the ALJ would get a new psychologist, along with an internal medicine specialist, to testify as impartial medical experts. Counsel chose this option.

At the third hearing, the new psychological expert, Dr. Allen Heinemann, testified that he was "confident" that plaintiff had bipolar disorder, anxiety disorder, and borderline personality disorder and that she could not work a full work week because she would need "frequent rest periods" and because she could not "accept feedback from a supervisor." R. 63-64. Dr. Heinemann conceded that plaintiff had a "chronic pattern of not cooperating adequately with treating sources." R. 67. However, he was never was asked directly whether he agreed with Dr. Peggau's claim that plaintiff was malingering and possibly engaged in drug-seeking behavior.

In his opinion finding that plaintiff was not disabled, the ALJ weighed the conflicting medical opinions as follows:

> As for the opinion evidence, Dr. [Rosch] [the new internal medicine specialist], an impartial medical expert, was given substantial weight for having reviewed all of the medical evidence of record, and for being present during the hearing testimony. She inferred that the claimant had no severe physical impairment, including no seizure disorder, only intermittent headaches and adequately controlled asthma.

---

[1] Counsel explained that he believed the Peggau report was "not founded on science and proper technique" and failed to address the fact that "we have the treating physicians who have rendered different diagnoses about [plaintiff's] condition." R. 105. Counsel also stated that Dr. Peggau "[b]asicallyl [] said there were no impairments other than malingering." *Id.*

> Dr. Peggau was given some weight for his consultative examination and opinion. Dr. Kuester and Dr. Hudspeth were also given some weight as [] non-examining doctors with an extensive knowledge of disability requirements.
>
> Dr. [Rosch], Dr. Peggau, Dr. Kuester, and Dr. Hudspeth's opinions were consistent with the medical evidence of record. No weight was given to Dr. [Tawfik], Dr. Rizvi, or the sundry therapists, including Ms. Gessner, who assigned low GAFs based upon what the claimant reported. The undersigned will accept Dr. [Heinemann's] assessment only in part, excluding the probability that the claimant would not be able to sustain a work week or supervisory criticism based upon what she said. The undersigned also has given the Dr. Rizvi and Dr. [Tawfik] opinion evidence limited weight because these sources specifically did not seem to exhibit longitudinal familiarity.

R. 23 (citations omitted). In addition to this explanation, the ALJ made occasional comments about these medical opinions in narrative portion of the opinion.

Plaintiff argues that the ALJ failed to follow the treating-physician rule. This Court agrees. As a matter of procedure, the ALJ did not follow the two steps contemplated by the treating-physician rule.[2] At Step One, the ALJ should have first assessed whether any of the opinions of plaintiff's treating physicians deserved controlling weight.[3] The ALJ did not make this assessment. Then, at Step Two, the ALJ should have explicitly applied the checklist of factors in assessing all of the medical opinions. Again, this was not done. In this Court's view, the failure to *explicitly* apply the checklist is by itself a ground for a remand. *See Duran*, 2015 U.S. Dist. LEXIS 101352 at *8-9.

However, even if this Court were to follow the more implicit approach advocated by the Government, the Court would still find a remand is warranted. Although the ALJ referred *indirectly* to *some* of the checklist factors, the ALJ did so in a sporadic and haphazard way. The ALJ selectively invoked factors, citing them when they supported the ALJ but ignoring them

---

[2] This Court has previously set forth in some detail its understanding of how the treating-physician rule works. *See, e.g., Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015).
[3] For example, Dr. Tawfik completed a Medical Opinion form in which he opined, among other things, that plaintiff "may become violent" on the job and would miss more than four days a month. R. 832.

3

when they supported plaintiff. This is classic cherry picking. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). The ALJ also glossed over obvious conflicts in the medical opinions. The following points provide support for these conclusions.

First, the ALJ never set forth the basic details about the length and nature of the treating relationships (*i.e.* the first and second checklist factors). It is thus not clear how often plaintiff saw Dr. Tawfik or Dr. Rizvi. Plaintiff claims that she had a "lengthy" relationship with them, although plaintiff, like the ALJ, did not provide specific details to prove the point. Dkt. #12 at 11. In any event, the larger point remains that the ALJ never gave any weight to the fact that these two doctors were treating physicians who had a more extensive relationship with plaintiff than either Dr. Peggau, Dr. Kuester, Dr. Hudspeth, or Dr. Rosch, whose opinions all were given more weight. In fact, the ALJ discounted the opinions of Dr. Tawfik and Dr. Rizvi by stating, vaguely and tentatively, that they "did not *seem to exhibit* longitudinal familiarity." R. 23 (emphasis added).[4] The ALJ did not apply this same scrutiny to the other opinions.

Second, the ALJ never addressed the fundamental contradiction at the heart of this case. As evidenced by the winding procedural history, there was a split in opinion between Dr. Peggau (who thought plaintiff was malingerer and drug-seeker with no real impairments) and Dr. Heinemann (who was "confident" plaintiff had several psychological impairments and was unable to work because of them). The ALJ never confronted this conflict head-on. Although the ALJ basically sided with Dr. Peggau, the ALJ never clearly explained why. If anything, Dr. Peggau's opinion was the outlier among the group as he was the only one who found plaintiff was malingering. The ALJ did not explain why, if he was relying on Dr. Peggau, he concluded at

---

[4] It should be noted also that the ALJ stated—at least at one point—that these two opinions deserved *no* weight. The proper application of the treating physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and adopted by the adjudicator.").

4

Step Two that plaintiff had the three psychological impairments diagnosed by Dr. Heinemann. The ALJ did not provide an explanation for why he rejected Dr. Heinemann's bottom-line conclusion that plaintiff would have to take frequent breaks and could not get along with others.

Third, the ALJ seems to have dismissed the opinions of plaintiff's therapists simply because they were social workers and not doctors. Referring to them as "sundry therapists," the ALJ stated that their opinions deserved no weight, although the ALJ provided no explanation for the conclusion. It is true that such therapists do not qualify as acceptable medical sources whose opinions can be given controlling weight. But this does not mean their opinions should be discarded outright. Instead, the ALJ should evaluate them using the checklist. *See* SSR 06-03p; *see Canales v. Commissioner*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (ALJ cannot merely disregard non-acceptable medical source opinions; instead ALJ must apply checklist and determine weight of opinions).

Fourth, another instance of cherry-picking is the fact that the ALJ did not apply the same standards when analyzing the opinions of the two testifying doctors (Heinemann and Rosch). Although they testified about different domains, mental versus physical impairments, they were otherwise similar in that neither treated nor examined plaintiff, and both heard the same testimony by plaintiff. Despite this parity, the ALJ gave Dr. Rosch's testimony "substantial" weight because she "reviewed all of the medical evidence of record" and because she was "present during the hearing testimony." These two rationales—tepid endorsements at that—should have applied equally to Dr. Heinemann, but the ALJ gave him no credit.

Rather than grappling with the specific reasoning of the medical opinions supporting plaintiff, the ALJ fell back on two broader arguments to discount those opinions in one fell

5

swoop. But these arguments rest on shaky grounds that, at a minimum, need more explanation and factual support.

The ALJ asserted repeatedly that plaintiff was not a reliable self-reporter. *See.* R 21 ("there is an issue as to whether [plaintiff] was able to provide accurate and specific detail"); R. 22 (two references to the same point); R. 23 (three references). This point was mentioned so often that it functioned like a universal acid burning through every medical opinion because they all, to one degree or another, relied on self-reports.[5] But the argument is questionable for several reasons. One is that the ALJ seemed to unrealistically expect that psychiatric diagnoses can be made without relying on such reports, an assumption the Seventh Circuit has questioned.[6] Another is that the ALJ gave only one specific example of where the plaintiff supposedly was an unreliable reporter, thus essentially invoking the dubious doctrine of *falsus in uno falsus in omnibus* (false in one, false in all). *See U.S. v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009). Finally, the one example is vague. The ALJ noted that one of plaintiff's therapists, Karen Gessner, wrote the following in a July 5, 2011 "To Whom It May Concern" letter: "Dinesha Sharp is a frequent patient at OSF Saint Anthony Medical Center. She has had seven Emergency Department visits and multiple physician office visits over the past 12 months for anxiety, headaches and seizures." R. 541, 21. The ALJ's explanation is fuzzy as to why this statement, one not made directly by plaintiff, was unreliable. It does not appear that the statement was technically inaccurate as plaintiff apparently did go to the emergency room multiple times. The ALJ's complaint seems to be that plaintiff somehow misreported the exact nature of her

---

[5] The ALJ proactively pushed this point at the hearing, asking Dr. Heinemann this leading question: "And if the client's not able to give accurate, specific details, it's like the sands that shook the time. You have no basis for making that judgment [*i.e.* that plaintiff could not work full-time]. Would you agree on that?" R. 68.

[6] *See, e.g., Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings"); *Schickel v. Colvin*, No. 14 C 5763, 2015 U.S. Dist. LEXIS 165463, at *40-41 (N.D. Ill. Dec. 10, 2015).

6

conditions as they were later diagnosed during these visits. But this seems to be a harsh standard because a person might be unsure what condition certain vague symptoms point to and might go to the emergency room simply to have them checked out.[7]

The other global rationale was that plaintiff was engaged in "medication-seeking." R. 21, Here again, other than Dr. Peggau, no medical provider raised such a concern. The ALJ's conclusion thus rests mostly on the ALJ's own analysis of the medical record. The ALJ catalogued instances where the plaintiff asked for specific medications, in particular Xanax. Although it is possible that plaintiff was abusing Xanax, this point is not clear, as there are other innocent explanations that were not explored. In making a request for a specific medication, a person may reasonably believe that the medication has been the most effective. Moreover, the ALJ picked out evidencing supporting this particular thesis without confronting the counter-evidence. *See, e.g.*, R. 460 (Dr. Peggy Shiels wrote that plaintiff "feels like the Xanax is not working and is interested in something else"). The ALJ also did not consider that financial considerations may have played a role. *See* R. 907 ("had a new prescription she could not fill because it was too expensive for her, saying it was about $180.").

In remanding this case, the Court is not dictating a particular result, as this Court recognizes that the evidence is not uniform and that plaintiff must overcome several significant hurdles if she is to be found disabled on remand. *See Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Still, the treating-physician rule requires a more complete and more explicit analysis than was provided by the ALJ.

---

[7] At the first hearing, the ALJ asked plaintiff why she went to the emergency room "fairly regularly." R. 141. Plaintiff explained: "they told me if I ever, you know, have the pain in my chest, and if I wasn't feeling up at ease that I could go to the hospital." *Id.*

Plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration consistent with this opinion.

Date: July 1, 2016  By: _____
Iain D. Johnston
United States Magistrate Judge